**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | 3:18-cr-00159-BR |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **NIKOLAY P. BOCHARNIKOV,** | |
| Defendant. | |

**BROWN, Senior Judge.**

This matter comes before the Court on Defendant Nikolay P. Bocharnikov's Motion (#28) to Suppress.

For the following reasons, the Court **DENIES** Defendant's Motion to Suppress.

### BACKGROUND

On April 20, 2018, a grand jury indicted Defendant on one count of Aiming a Laser Pointer at an Aircraft in violation of 18 U.S.C. § 39A.

On February 22, 2019, Defendant filed a Motion to suppress statements he made on March 20, 2018.

1 - OPINION AND ORDER

On March 7, 2019, the Court conducted an evidentiary hearing on Defendant's Motion to Suppress, heard oral argument, and directed the parties to file supplemental memoranda.

On March 11, 2019, the parties filed their supplemental pleadings, and the Court took Defendant's Motion to Suppress under advisement.

**FINDINGS OF FACT**

The Court finds the following facts by a preponderance of the evidence:

On the evening of July 11, 2017, Portland Police Bureau Tactical Operations were conducting aircraft surveillance over Gresham, Oregon. During this operation the police aircraft was "struck" by a laser light from the ground that temporarily blinded the pilot. The aircraft was able to determine the origin of the laser beam and notified the Gresham Police Department of the address.

Shortly after midnight Deputy Adam Kraushaar, Sergeant Hakala, and Sergeant Matt Jordan of the Multnomah County Sheriff's Department were dispatched to the address identified. All of the officers were wearing full uniforms. Deputy Hakala initially contacted Defendant's wife at the door of the residence, and she stated Defendant was just getting out of the

2 - OPINION AND ORDER

shower. Defendant came to the door wet and wearing only his underwear. When Deputy Hakala questioned Defendant about the incident, Defendant denied any involvement and stated: "It was the kids." After a brief conversation, Defendant was handcuffed by Sergeant Hakala and was seated on the front porch of his residence. Defendant was advised about the seriousness of the incident and that the officers were there only to recover the laser in question. Defendant then admitted he had shined the laser in the direction of the aircraft, but he stated he did not think the laser beam would reach the aircraft. Defendant apologized for his actions and told his wife where the laser was located. The officers seized the laser as evidence, Defendant was released from the handcuffs, and the officers left the residence. Defendant was not arrested and was not given *Miranda* warnings at any time.

In August 2017 Special FBI Agent Adam Hoover was assigned to investigate the July 2017 laser incident. Although Agent Hoover personally has some concern about the legality of the July 2017 interrogation, he does not recall any discussion with Deputy Kraushaar about it when he met with Deputy Kraushaar regarding the incident. Defendant did not offer any evidence to contradict this assertion. The Court concludes Agent Hoover did not discuss the matter with Deputy Kraushaar.

On March 20, 2018, Agent Hoover went to Defendant's home intending to interview him as part of his investigation. Agent Hoover arrived at Defendant's residence; parked across the street; and while he waited for his partner to arrive, Agent Hoover saw Defendant come out of his house and walk toward his work vehicle. Agent Hoover got out of his car, waved to get Defendant's attention, crossed the street, and greeted Defendant. Agent Hoover then introduced himself as a member of the FBI Joint Terrorism Task Force and showed his credentials to Defendant. Agent Hoover was dressed in civilian clothes without any identifying marks, and his duty weapon and handcuffs were not visible.

Agent Hoover was standing on the sidewalk in front of Defendant's residence and was approximately five to ten feet away from Defendant during their encounter. Agent Hoover asked Defendant if he "could ask some follow-up questions regarding the laser strike from the previous summer." Defendant almost immediately said something to the effect "that [it] was a stupid thing to do" and "it was a mistake." Defendant again stated he did not know the laser was powerful enough to hit an aircraft.

The interview lasted 20-40 minutes, and Agent Hoover's partner arrived about five minutes into the interview, took the notepad that Agent Hoover was using, and assumed the role of

note-taker also standing five-to-ten fee from Defendant.  During the interview Agent Hoover did not mention Defendant's July 2017 conversation with law enforcement, Defendant's July 2017 confession, or the July 2017 seizure of the laser nor did he give Defendant any *Miranda* warnings.  Defendant, however, referenced the July 2017 interrogation and said he initially denied his involvement because he was afraid of the police.  Defendant is a native of Kyrgyzstan and indicated it is not a good thing if the police come to your house even if you are innocent.  Nevertheless, the Court find credible Agent Hoover's testimony that Defendant's demeanor during the interview was "friendly," "polite," and "relaxed," and Defendant did not appear to hesitate to speak with him.

At the end of the interview Defendant asked what was going to happen next.  Agent Hoover said he would write a report, he would submit it to the U.S. Attorney's Office, they would make a final decision on how to proceed, and Defendant would be notified of that decision.  Agent Hoover and the Defendant said good-bye and shook hands.  Defendant got into his vehicle and left.

5 - OPINION AND ORDER

## STANDARDS

> The Constitution demands that confessions be made voluntarily. *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972). A confession is involuntary if coerced either by physical intimidation or psychological pressure. *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981). The test is whether [the agents] overbore [the subject's] will when he confessed.

*United States v. Haswood,* 350 F.3d 1024, 1027 (9th Cir. 2003) (citations omitted). *See also United States v. Tobie*, 411 F. App'x 995 (9th Cir. 2011).

## DISCUSSION

Defendant contends his March 2018 statements were not made voluntarily as an act of free will, the improper circumstances surrounding the July 2017 confession continued to taint Defendant's later statements, and there were not sufficient attenuating circumstances to remove such taint. Defendant also asserts for the first time in his Supplemental Memo that his confession in July 2017 was unlawfully induced by the "implicit promises of leniency" made by officers during the interrogation.

According to the government, however, Defendant voluntarily made the statements in March 2018 and, in any event sufficient time had elapsed to remove from Defendant's July 2017 confession the taint that the government agrees exists because the July 2017 confession was illegally obtained and, therefore, is not

6 - OPINION AND ORDER

itself admissible.

I. **The March 2018 interview was not "custodial," and Defendant's confession was voluntary.**

   A. **Standards**

The Supreme Court has recognized "interrogation in certain custodial circumstances is inherently coercive and . . . that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984).

"Generally, a suspect's *Miranda* rights are triggered during custodial interrogation." *United States v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007)(citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 656 U.S. 499, 508-09 (2012). Whether someone was in custody is determined by whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). *See also Howes v. Fields*, 565 U.S. 499, 509 (2012). To determine whether a defendant was in custody, courts must look at "all of the circumstances surrounding the interrogation."

7 – OPINION AND ORDER

*Stansbury v. California*, 511 U.S. 318, 322 (1994). *See also United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).

Five specific factors help to determine someone's custodial status: (1) the language used to summon the individual, (2) the extent to which the defendant is confronted with evidence of guilt, (3) the physical surroundings of the interrogation, (4) the duration of the detention, and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002). These factors are not exhaustive, and courts are allowed to use any other factors to determine whether someone was in custody. *Id.*

The government bears the burden to establish by a preponderance of the evidence that a challenged statement was made voluntarily. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). *See also United States v. Tobie*, 411 F. App'x 995 (9th Cir. 2011).

**B.   Analysis**

As noted, Agent Hoover asked Defendant whether he could ask some follow-up questions regarding the July 2017 incident; *i.e.*, he was asking Defendant's permission to speak with him about the incident—not demanding that Defendant do so. Agent Hoover did not refer to Defendant's prior interrogation, to his prior confession, or even to the fact that the laser had

been seized from Defendant as evidence.  In addition, Agent Hoover was in plain clothes, his service weapon was not visible, and he did not show or assume any authoritative posture other than to present his identification.  The incident happened on the public sidewalk in front of Defendant's residence, and, as noted, the conversation with Defendant was "friendly" and "relaxed."  Moreover, Agent Hoover did not at any time suggest Defendant could not leave, and the presence of Agent Hoover's partner as a note-taker, also some distance from Defendant, did not significantly change the voluntariness of this encounter.

Thus, the March 2018 interview is in stark contrast to the July 2017 interrogation by Multnomah County Sheriff's officers who were in full uniform with firearms displayed while Defendant was wet and in his underwear at his front door being questioned.  Notably, it was not until Defendant was handcuffed during that interrogation that he admitted pointing the laser at the aircraft.

At the March 2018 interview, as noted, Agent Hoover identified himself as an FBI agent with the Terrorism Task Force, which is a completely different law enforcement agency. Agent Hoover explained that one of his responsibilities was criminal matters pertaining to aircraft.  Then, without any show of force or authority, Agent Hoover asked whether he could ask

questions regarding the July 2017 incident.  Only then did Defendant promptly admit his involvement and stated it was "a stupid thing to do."  As noted, the conversation between Agent Hoover and Defendant continued for 20-40 minutes.  When the conversation ended, Agent Hoover said good-bye, he shook Defendant's hand, and Defendant went to his vehicle and left.

On this record the Court concludes the totality of the circumstances surrounding the March 2018 interview demonstrate it was not a continuation of the July 2017 interrogation, that Defendant was not in a custodial situation, and that Defendant's March 2018 statements were made voluntarily as an act of his free will.

**II.   The March 2018 statements were not tainted by the earlier illegal interrogation and confession.**

**A.   Standards**

The circumstances surrounding a prior illegal confession may carry over and taint a subsequent confession rendering it inadmissible.  *United States v. Lee*, 699 F.2d 466, 468-69 (9th Cir. 1982).  In order for the causal chain to be severed, the second confession must be an act of free will sufficient to purge the primary taint.  *Brown v. Illinois*, 422 U.S. 590, 602 (1975).  The Supreme Court has identified factors to be considered when determining whether a confession has been

10 – OPINION AND ORDER

purged of such taint: (1) the temporal proximity of the arrest and confession, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. 422 U.S. at 603. *See also United States v. Washington*, 490 F.3d 765, 776 (9th Cir. 2007).

After the defendant has shown "specific evidence demonstrating taint," the government bears the burden to show the taint was sufficiently attenuated to allow admission of the evidence. *U.S. v. Perez-Exparaza*, 609 F.2d 1284, 1290 (9th Cir. 1979). *See also United States v. Washington*, 490 F.3d 765, 777 (9th Cir. 2007).

    B.   **Analysis**

As noted, the government concedes the July 2017 interrogation was improper; Defendant's July 2017 confession was obtained illegally; and, therefore, the July 2017 interrogation and confession are inadmissible. As noted, the March 2018 interview was almost eight months later in noncustodial circumstances by someone with a different law-enforcement agency who asked permission to interview Defendant. Although the Court has already concluded Defendant's March 2018 statements were made voluntarily, the issue remains as to whether the improper circumstances of the July 2017 interrogation tainted the March 2018 statements.

11 – OPINION AND ORDER

Defendant argues his knowledge of the July 2017 interrogation and Agent Hoover's reference to "following-up" on that "incident" tainted Defendant's March 2018 statements. Defendant also contends his upbringing in Kyrgyzstan where human rights are routinely violated and his ever-present fear of the police continued the taint from the July 2017 unlawful interrogation. The Court notes a defendant's personal characteristics are one of the factors a court may consider when determining whether a defendant's will is overcome and whether his statement or consent is voluntary. *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007).

As noted, however, Agent Hoover did not make any reference to the July 2017 illegal interrogation or to Defendant's July 2017 confession. Agent Hoover only asked whether he could speak to Defendant about "the laser strike from the previous summer"; *i.e.*, the "follow-up" was not about the July 2017 interrogation, but about the laser incident. Moreover, eight months had elapsed between the two interviews, different officers conducted the interviews, and Agent Hoover did not make any reference to the July 2017 interrogation during the March 2018 interview. Each of these factors support a causal break between the interviews that is sufficient to obviate any taint on the March 2018 statements from the July

2018 interrogation.  *See Missouri v. Siebert* 542 U.S. 600, 616 (2004).

The Court also notes the Supreme Court has found the test of voluntariness includes whether the confession was "obtained by any direct or implied promises, however slight." *Hutto v. Ross*, 429 U.S. 28, 30 (1976).  More recently the Supreme Court had held promises made by law enforcement must be evaluated under the totality of the circumstances.  *Arizona v. Fulinante*, 499 U.S. 279, 285 (1991).  Defendant asserts for the first time in his Supplemental Memo that his July 2017 confession was unlawfully induced by the officers' implied promise of leniency, and his subsequent decision to speak to Agent Hoover was an extension of his reliance on the implicit promise of nonprosecution.

As noted, after Defendant was handcuffed during the July 2017 interrogation Sergeant Hakala told Defendant that they were there only to recover the laser used in the incident.  Defendant then admitted to pointing the laser, and Defendant was released after the officers recovered the laser.  In March 2018, however, when Defendant asked what would happen following that interview, Agent Hoover stated it would be up to the United States Attorney's Office to decide whether to prosecute.  The record does not reflect anyone made a promise to Defendant that

13 - OPINION AND ORDER

he would or would not be prosecuted as a result of his confession during the July 2017 incident.

Based on the totality of these circumstances, the Court concludes the taint from the prior interrogation does not render Defendant's statements in March 2018 inadmissible.

## **CONCLUSION**

For these reasons, the Court **DENIES** Defendant's Motion (#28) to Suppress Defendant's March 2018 statements.

IT IS SO ORDERED.

DATED this 13th day of March, 2019.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States Senior District Judge